Barbara WYTRWAL, Plaintiff,

v.

Cynthia MOWLES, et al., Defendants.

Civ. No. 93–360–P–C.

United States District Court, D. Maine.

May 5, 1995.

William C. Nowles, James A. McCormack, Carl E. Kandutsch, Verrill & Dana, Portland, ME, for plaintiffs.

Jerrol A. Crouter, Eric R. Herlan, Drummond, Woodsum, Plimpton & MacMahon, Portland, ME, for defendants.

## MEMORANDUM OF DECISION AND ORDER [1]

GENE CARTER, Chief Judge.

Plaintiff Barbara Wytrwal started teaching behaviorally impaired students at Saco Middle School in the fall of 1990.[2] Ex. J–12; Tr. Vol. IV at 8; Tr. Vol. III at 79. Wytrwal, like all other new teachers, was in probationary status for the first two years. Ex. J–12; Tr. Vol. I at 8. At the end of a second probationary year, teachers are considered for continuing contract status, which is similar to being awarded tenure. Tr. Vol. I at 9, 51. After two years, Wytrwal's contract at Saco Middle School was not renewed. Ex. J–12. Wytrwal claims that she was not continued because, at a school board meeting, she criticized the special education department and alleged that Saco Middle School was violating special education laws. Wytrwal's Complaint seeks recovery for violation of the Civil Rights Act (Count I), 42 U.S.C. § 1983, the Maine Whistleblowers Protection Act (Count II), 26 M.R.S.A. § 833(1), as well as common law theories of intentional infliction of emotional distress (Count III) and wrongful discharge (Count IV). The Court finds for Defendants on all counts.

---

1. Throughout this opinion, the Court refers to volumes of the trial transcript as Tr. Vol. I–V. Mowles's testimony is found in Volumes I and V. Savadove's testimony is found in Volume II. The testimony of Goodness, Stickney, Voci, Wilder and Burgess is found in Volume III. Wytrwal's testimony is found in Volume IV. The testimony of DeSimone, Lander, Booth, Hadiaris and Bourne is found in Volume V.

2. Wytrwal had been a teacher for a number of years prior to teaching at Saco Middle School.

## I. FINDINGS OF FACT

### A. Background

Upon review of the credible testimony produced at trial from October 12–14, 20, and 25, 1994, the stipulations entered into by the parties and the exhibits introduced in evidence, the Court finds the facts to be as set forth below.

The decision whether to renew Wytrwal's contract rested with Dr. Cynthia Mowles who served as Superintendent of Schools for Saco School District during both the 1990–91 and 1991–92 school years. Tr. Vol. I at 4. David Stickney was the Director of Special Education for Saco School District and served as Wytrwal's direct supervisor during the 1990–91 school year, but during Wytrwal's second year at Saco, although he was ultimately responsible for special education, he was not Wytrwal's direct supervisor.[3] Ex. J–12; Tr. Vol. III at 84. During the 1990–91 school year, Gregory T. Goodness was the interim Principal at Saco Middle School. Ex. J–12; Tr. Vol. III at 1–2; Tr. Vol. I at 9. The following year, the 1991–92 school year, Joseph Voci held the position of Principal of Saco Middle School and served as Wytrwal's direct supervisor during that year. Ex. J–12; Tr. Vol. III at 129. During the 1991–92 school year, Goodness was Assistant Principal of Saco Middle School. Ex. J–12; Tr. Vol. III at 1.

Meeting the needs of behaviorally impaired students was described as employing a multi-disciplinary team approach. Tr. Vol. III at 74–76. Special education teachers work with a variety of other teachers and specialists including speech therapists, social workers, occupational therapists, and physical therapists. Tr. Vol. I at 53. At the heart of this team concept is a Pupil Evaluation Team or PET. A PET meeting is a meeting with a team of professionals to determine the placement and educational program for a student. Tr. Vol. I at 81; Tr. Vol. III at 77–78. The PET decision-making process is a team process with the intent of reaching a consensus. Tr. Vol. III at 78, 80. After a PET meeting is held, an Individualized Education Program or IEP, is developed for the student. Tr. Vol. I at 82. An IEP report defines the educational program needs of an individual student. Tr. Vol. I at 82. If the PET is unable to reach agreement on an issue such as an appropriate placement for a student, the Special Education Director has the authority to make the final determination on the student's placement. Tr. Vol. III at 80, 81. Placing a student outside of the school district would have an impact on the school budget. Tr. Vol. I at 6–7. Mowles testified that she had budgetary concerns in the 1991–92 school year, that funds were extremely limited for special education. Tr. Vol. I at 7.

### B. Differences Between Wytrwal's First and Second Years at Saco

When Wytrwal started teaching at Saco, the special education department was moving toward "mainstreaming," and the students were being housed, for the first time, inside the Saco Middle School building.[4] Tr. Vol. I at 53. Mainstreaming means incorporating special education students into the regular classroom as much as possible, with the goal being for the student to make the transformation back to full time in the regular classroom. Tr. Vol. I at 53. Because of the emphasis on mainstreaming, the expectation was for the special education teachers to work very closely with classroom teachers to facilitate the transition of students back and forth between special education and regular classrooms. Tr. Vol. I at 53.

During the 1990–91 school year, the majority of students were placed in Wytrwal's classroom as an option to avoid more expensive placements out of the district and also to

---

3. David Stickney has been the special education director since 1989 for the Saco School District. Tr. Vol. III at 79. Stickney explained that the Special Education Director's responsibilities are "to ensure that the provision of the special education services meet the statutory requirements which are provided in both federal and state statutes and provided in a manner providing most appropriate programs for children and doing that within the budgetary constraints that we are working under." Tr. Vol. III at 49–50.

4. Behaviorally impaired students from Saco Middle School had previously been housed in a trailer outside the building.

afford some students more involvement in regular classroom. Tr. Vol. III at 78. During the second year, the direction of the special education program changed, with more emphasis placed on moving the behaviorally impaired students out of the special education classroom and into regular classrooms. Tr. Vol. III at 100–101. In addition to there being a change in the focus of the program the second year, the number and type of students were also very different in Wytrwal's class. Tr. Vol. III at 195.

The first year, Wytrwal's class started with four students and increased to six over the course of the school year. Tr. Vol. IV at 21. The second year, her classroom started with eleven and continued to increase.[5] Tr. Vol. IV at 21; Tr. Vol. III at 195. Wytrwal's students during the second year had more serious problems. Tr. Vol. III at 100, 197; LeBlanc Depo. at 7. A few of the more problematic students during the second year, who were not in Wytrwal's class during the 1990–91 school year, were described as extremely dangerous, suicidal, and violent to themselves and others. Tr. Vol. IV at 20, 50; Tr. Vol. III at 195. Wytrwal testified that having these students in her classroom made it difficult to keep order and operate the classroom. Tr. Vol. IV at 20. Either Wytrwal or her assistant, Barbara Burgess, had to sit directly across from these students so that they would not attempt to hurt themselves. Tr. Vol. IV at 20–21. These students, Wytrwal testified, did not belong in her classroom. Tr. Vol. IV at 50. In addition, there were two students the second year who were on court ordered probation and, as a condition of their probation, they were not supposed to have contact with each other. Tr. Vol. III at 195.

All the administrators agreed that Wytrwal's first year at Saco was very successful.[6] Tr. Vol. I at 56, 58, 60; Tr. Vol. III at

28. Wytrwal's program was called "The Learning Connection." Tr. Vol. I at 59. The crown jewel of Wytrwal's program the first year was the development and execution of a holiday open house which showcased the special education program. Tr. Vol. III at 16–17. The holiday open house program consisted of Wytrwal's students making all the preparations for and the cooking of a complete dinner for parents, select members of the community, school personnel, and other students.[7] Tr. Vol. I at 56. Although Wytrwal's overall performance was a success the first year, there was some concern raised regarding her relationship with Stickney, the Director of Special Education. Tr. Vol. I at 62.

As there was agreement by the administrators about Wytrwal's first year performance, there was also agreement that there were significant changes in her second year performance. Wytrwal testified that she had to focus so much effort on a few students in her classroom the second year that it made teaching more difficult. Tr. Vol. IV at 52. She testified that during the second year, there were problems in her classroom that must have been visible to the administrators in the school. Tr. Vol. IV at 51–52. Stickney testified that Wytrwal had trouble interacting with regular education teachers in supporting them. Tr. Vol. III at 101. On the other hand, Burgess testified that Wytrwal maintained a good, positive relationship with her students the second year. Tr. Vol. III at 197.

### C. Problems Between Wytrwal and Stickney

From the start of Wytrwal's teaching at Saco Middle School, she and Stickney clashed. Tr. Vol. I at 36–37. This was mainly attributed to philosophical differences

---

5. Wytrwal testified that Voci and Goodness would "time-out" students from the mainstream into her classroom. Tr. Vol. IV at 21. She testified that at times during the second year, she had eighteen students in the classroom. Tr. Vol. IV at 21.

6. During her first year, Wytrwal received two certificates of appreciation from Mowles: one for outstanding work on the holiday open house and

the other for work on the food distribution program. Exs. D–158, D–159; Tr. Vol. I at 57–58.

7. Burgess testified that there was no holiday program the second year because the students were not appropriate to bring into the home economics room; that they could not handle utensils used in home economics; and that they would hurt each other. Tr. Vol. III at 204.

about special education. Tr. Vol. IV at 26, 74–75; Tr. Vol. III at 28–29, 52. An early confrontation between Stickney and Wytrwal set up a power struggle in terms of who was in charge of special education. Tr. Vol. III at 34, 54–55. Wytrwal testified that she argued vehemently with Stickney regarding the allegations of violations of law but that this was done in private between themselves. Tr. Vol. IV at 25; Tr. Vol. I at 66. The first year, Goodness was involved in dealing with problems that arose between Wytrwal and Stickney.[8] Tr. Vol. III at 29. After these early confrontations, Stickney withdrew from direct interactions with Wytrwal out of a combination of personal frustration and personal avoidance. Tr. Vol. III at 58, 93. Wytrwal testified that she did not respect Stickney but maintained a professional working relationship with him as best she could. Tr. Vol. IV at 25. It was generally known that Wytrwal and Stickney did not work well together.[9] Tr. Vol. III at 153–54.

### D. Why Wytrwal was Invited to Speak at the School Board Meeting

Wytrwal testified that sometime in October of 1991, around 8:00 p.m., she received a telephone call at home from the father of one of her students. Tr. Vol. IV at 16, 84. The man was frantic, telling Wytrwal that an ambulance had just taken his wife to the hospital after she had attempted suicide be-

cause the student was very abusive and violent, threatening his stepmother with a metal pipe, and that he had put the pipe through the television set. Tr. Vol. IV at 16, 84. The man told Wytrwal that he had called Jackson Brook Institute (JBI) and was told that they would not take a referral from him—that the referral had to come from either the school or the police department. Tr. Vol. IV at 84. Wytrwal testified that she advised him to stay away from his son, Tr. Vol. IV at 84, and, after unsuccessful attempts to reach members of the school's crisis intervention team, Wytrwal drove to the school where she was aware there was a board meeting in progress. Tr. Vol. IV at 16, 84–85. Wytrwal interrupted the meeting and asked to speak with Voci and Goodness. Tr. Vol. IV at 85. Wytrwal explained the situation to them, and Voci and Goodness advised her to notify the police. Tr. Vol. IV at 16–17, 85. Wytrwal telephoned the police from the school office and was directed to stay by the phone until the police got back to her. Tr. Vol. IV at 17, 85. The police did not call Wytrwal back until sometime around 11:00 o'clock that night. Tr. Vol. IV at 17, 85, 86.

In the meantime, Elizabeth DeSimone, a member of the Saco School Board, came downstairs during a break in the board meeting to get a soda and, surprised to see Wytrwal there, DeSimone asked, "What are you

---

8. A confrontation between Stickney and Wytrwal arose after Wytrwal provided Stickney with an outline for her special education program so that he could present it to the school board. Ex. D–104; Tr. Vol. III at 55. Wytrwal called her program "The Learning Connection." Tr. Vol. III at 55. The outline of the Learning Connection program given to Stickney was the same program Wytrwal had used in a previous school district. Tr. Vol. III at 55–56. Stickney testified that when he made some changes to this outline to fit the program at Saco Middle School, Wytrwal became upset and wrote him a memo. Ex. D–106; Tr. Vol. III at 56. Wytrwal thought Stickney presented the program as his own to the school board and did not give Wytrwal credit for developing the program. Stickney testified that he made no substantive changes to the outline when he submitted it to the school board and he denied presenting the program as his own. Tr. Vol. III at 56, 88.

   The next major confrontation that Stickney recalls occurred in October 1990 when the school district hired a new social worker. Tr.

Vol. III at 56. Social workers had been an integral part of the special education program. Tr. Vol. III at 56. Stickney testified that he brought the new social worker, Arnold Davis, into Wytrwal's classroom to meet her and the students, Tr. Vol. III at 56, after which, Stickney received a letter from Wytrwal criticizing the way he had presented Davis to the classroom. Ex. D–107; Tr. Vol. III at 56, 90–91. Stickney testified that he was put off because Wytrwal had put her criticisms in memo form and that, since she was an employee who had worked for the school district for less than eight weeks, he was frustrated and concerned. Tr. Vol. III at 56–57.

9. Wilder testified that at a PET meeting which was held in a very small office, Stickney told Wilder a joke about lesbians. Tr. Vol. III at 185. Wilder testified that after the meeting, Wytrwal asked him if Stickney had told him a joke about lesbians and when he responded, "Yes," she asked him if he would remember that. Tr. Vol. III at 185.

doing here so late?" [10] Tr. Vol. IV at 17, 87–88; Tr. Vol. V at 7, 8. Wytrwal explained the situation to DeSimone.[11] Tr. Vol. IV at 17, 88. At some point in the conversation, DeSimone asked Wytrwal what was happening with another one of her students. Tr. Vol. IV at 88. Wytrwal explained that she had students in her classroom who did not belong there, Tr. Vol. IV at 88, and that no one would listen. Tr. Vol. IV at 88. Wytrwal also testified that DeSimone asked her why these students were not placed outside the district. Tr. Vol. IV at 17. DeSimone asked to meet with Wytrwal to discuss the matter more thoroughly. When Wytrwal agreed, DeSimone invited her to contact her the following day, or sometime that week, in order to set up a meeting. Tr. Vol. IV at 17, 88. Wytrwal later called DeSimone and arranged for them to meet in her classroom after school sometime in late October. Tr. Vol. IV at 17, 89–90. DeSimone met with Wytrwal and Barbara Burgess in the special education classroom.[12] Tr. Vol. IV at 18, 58–59, 90; Tr. Vol. III at 193; Tr. Vol. V at 11–12. The meeting lasted approximately forty minutes to one hour. Tr. Vol. IV at 94. DeSimone had numerous questions regarding why certain students were in Saco Middle School.[13] Tr. Vol. IV at 18; Tr. Vol. III at 193. Wytrwal discussed with DeSimone her concerns about certain students who she felt should not be in her classroom and explained that the consensus from the PET meetings was being ignored by Stickney. Tr. Vol. IV at 18, 60–6. Wytrwal explained to DeSimone that there had been a number of PET meetings concerning this particular student in which the consensus was that the student needed to be sent out of the district. Tr. Vol. IV at 91. Wytrwal told DeSimone that Stickney stood up in a PET meeting and said, "I will overrule whatever this PET has to say." [14] Tr. Vol. IV at 12, 18, 91–92. In the meantime, this student remained in Wytrwal's class. Tr. Vol. IV at 92. Wytrwal was concerned because outside agencies were telling her that this student needed help quickly and the special education department was just rescheduling PET meetings.[15] Tr. Vol. IV at 91.

Wytrwal told DeSimone that in her opinion what was happening was illegal. Tr. Vol. IV at 18. Burgess corroborated that Wytrwal told DeSimone that there were violations of state regulations regarding psychological testing and social work with the students. Tr. Vol. III at 194–95. Because DeSimone was not familiar with the legal requirements

10. Elizabeth DeSimone was a member of the Saco District School Board for the years 1990–91 and 1991–92. Tr. Vol. V at 6. DeSimone first met Wytrwal sometime during the 1990–91 school year when she did a practicum in Wytrwal's classroom for a few weeks in order to renew her teaching certificate. Tr. Vol. V at 6, 7; Tr. Vol. IV at 86.

11. DeSimone testified that she had no recollection regarding the substance of her conversation with Wytrwal. Tr. Vol. V at 9.

12. Burgess was the teacher assistant in Wytrwal's classroom during the 1990–91 and 1991–92 school years. Tr. Vol. III at 192.

13. DeSimone testified that she could not recall why she went to the meeting and did not specifically recall what was discussed. Tr. Vol. V at 12–13.

14. When asked if she had any recollection of whether she discussed with Wytrwal the fact that PET meetings were being predetermined, DeSimone responded, "That sounds familiar, but I don't know if that was, if that's something that sounds familiar from the meeting or if that is something that sounds familiar from another

conversation, maybe with someone else." Tr. Vol. V at 13–14.

15. Wytrwal testified that DeSimone asked her if she had tried to convince Stickney to place the student, and Wytrwal responded that she had tried repeatedly, but he would not change his point of view. Tr. Vol. IV at 19. Wytrwal testified that she told DeSimone that early in the year, Stickney had told her that the placements were not going to happen because the financial budget was in such a crunch, and the program was supposed simply to meet the students needs. Tr. Vol. IV at 19.

Wytrwal testified that DeSimone also asked her about some concerns that she had regarding Arnold Davis, a school social worker. Tr. Vol. IV at 19, 92. The issue with Davis involved his ability to control the students and whether they respected him. Tr. Vol. IV at 92. Wytrwal testified that the situation was not only serious for the students, but that it presented liability issues if anything were to happen. Tr. Vol. IV at 92. In addition, Wytrwal testified that DeSimone was very interested in a fight that had taken place between Voci and a special education student. Tr. Vol. IV at 90.

regarding special education, she asked if Wytrwal could explain them to her. Tr. Vol. IV at 18. Wytrwal went to her filing cabinet, took out the regulations for special education, and explained how an IEP is developed and how the PET process is carried out.[16] Tr. Vol. IV at 18, 93; Tr. Vol. III at 195.

Based on the discussion at that meeting, DeSimone asked Wytrwal if she would be willing to come into executive session of the school board and express her concerns about proper student placement, regulation violations, and liability for the school.[17] Tr. Vol. IV at 9, 19–20, 58, 61, 93. Wytrwal agreed and DeSimone told her, "I am going to need to find a creative way to get you into executive session." Tr. Vol. IV at 19, 93–94; Tr. Vol. III at 193. DeSimone told Wytrwal that she would send her notice through Voci about when to attend the board meeting. Tr. Vol. IV at 94.

Sometime thereafter, Voci went to Wytrwal's classroom and told her that DeSimone had requested that she attend the February 11, 1992, school board meeting.[18] Tr. Vol. IV at 20, 94; Tr. Vol. III at 158. Voci mentioned that there was going to be a discussion about alternative education, and DeSimone asked him to tell Wytrwal to be ready to support the alternative education program. Tr. Vol. IV at 95, 96. Wytrwal testified that she understood this to be the creative way to get her into executive session. Tr. Vol. IV at 96; Tr. Vol. III at 195. At this time, the school board was considering an alternative education program intended to serve students who were "falling through the cracks" and in jeopardy of dropping out of school. Tr. Vol. IV at 9; Tr. Vol. I at 79. Alternative education is a program designed for students who are having difficulty in school, but who do not technically qualify for special education. Tr. Vol. I at 79. Mowles was in favor of developing an alternative education program at Saco and was requesting funds from the city council to implement this program. Tr. Vol. I at 79.

### E. The School Board Meeting

Superintendent Mowles was responsible for preparing the agenda for the school board meetings. Tr. Vol. I at 104. Wytrwal's presentation did not appear on the meeting agenda because DeSimone did not tell Mowles until sometime during the day of the meeting that Wytrwal was going to make a presentation at the school board meeting. Tr. Vol. I at 78, 103–104, 105. Mowles understood that Wytrwal's presentation would be on the proposed alternative education program. Tr. Vol. I at 80, 105.

Present at the February 11, 1992, school board meeting were Mowles, Stickney, Voci, Goodness, Wytrwal, and Paulette LeBlanc. LeBlanc Depo. at 4. Also present were the five members of the school board: Susan Hadiaris, chair, and board members Elizabeth DeSimone, Leroy Lander, Haley Booth, and Arthur Hilderbrand[19]. Tr. Vol. I at 12; Tr. Vol. V at 58. During the public session of the meeting, alternative education was discussed. Tr. Vol. V at 22; Tr. Vol. III at 112–13. After the public session items were discussed, the board voted to go into executive session.[20] Tr. Vol. IV at 101. Wytrwal testi-

---

16. DeSimone testified that she had no recollection of Wytrwal taking regulations out of her filing cabinet and discussing them. Tr. Vol. V at 15. However, DeSimone testified that she was not able to dispute Wytrwal's testimony that she did so. Tr. Vol. V at 15.

17. Wytrwal and Burgess agreed that DeSimone felt there were definite violations and that she appeared to be very concerned. Tr. Vol. III at 195; Tr. Vol. IV at 92. DeSimone testified that she arranged for Wytrwal to attend the February 11 school board meeting. Tr. Vol. V at 16. DeSimone explained that Wytrwal's purpose in coming to the school board meeting must have been "whatever she had told me in the after-school meeting, I must have felt was something that was appropriate that she should share with the whole board." Tr. Vol. V at 17.

18. DeSimone testified that she did not recall talking to Voci about Wytrwal's presence at the school board meeting. Tr. Vol. V at 19.

19. Despite efforts, neither party was able to locate the fifth board member, Arthur Hilderbrand, and present him as a witness. The Court thought Hilderbrand's testimony would be worthwhile and, thus, asked the parties to find him.

20. Hadiaris testified that at the February 11 board meeting, there was a vote to go into executive session to meet with a teacher. Tr. Vol. V at 59. Hadiaris remembered that when the board took a short break, she asked DeSimone what this matter concerned because it was not on the agenda. Tr. Vol. V at 59. Hadiaris was told by

fied that when the meeting went into executive session, some informal discussion continued regarding the alternative education program and she spoke in favor of this program. Tr. Vol. IV at 65. The minutes of the school board meeting reflect that the executive session started at 10:20 p.m., and that it ended at approximately 11:40 p.m. Ex. D–138. Wytrwal spoke for approximately forty minutes and left before the executive session concluded. Tr. Vol. IV at 14, 66–67.

Although it was a fairly unusual event to have a teacher appear in executive session before the school board, everyone agrees that Wytrwal participated in the executive session. Tr. Vol. V at 20, 21, 24; LeBlanc Depo. at 6. There was, however, no agreement on the substance of Wytrwal's presentation to the school board. After meticulous review of the transcripts, the Court finds that the testimony regarding what Wytrwal said in the executive session of the school board meeting presents a curious spectrum of observational perception. In general, the testimony of the administrators and board members was contradictory and cannot be reconciled. The Court does not wholly credit any one version of what happened at the board meeting. The Court finds that Wytrwal made the allegations of legal violations resulting from improperly placed students but that they did not have the impact she expected. The Court has laid out the testimony of all persons attending the executive session in order to demonstrate the variety of versions of what Wytrwal testified as a fairly straightforward event.

### 1. Wytrwal's Account

Wytrwal prepared a handout so that the board members could have a basic understanding of what she was talking about and distributed it at the meeting. Tr. Vol. IV at 61–62, 63; Tr. Vol. V at 27; Ex. D–114. The handout does not include any direct criticisms of the special education department or anything regarding violations of laws or regulations by the special education department at Saco Middle School. Tr. Vol. IV at 62, 63–65. The handout is, however, entitled "IMPACT OF NOT HAVING PROGRAMS THAT ARE DESIGNED SPECIFICALLY TO MEET THE NEEDS OF EMOTIONALLY/BEHAVIORALLY IMPAIRED." Ex. D–114. The handout does not incorporate, and Wytrwal corroborated that no part of her presentation for the board involved, alternative education. Tr. Vol. IV at 65.

Wytrwal testified that in executive session, DeSimone asked her what was going on with certain students and why those students were not being placed out of the district. Tr. Vol. IV at 10, 104. Wytrwal spoke very specifically, giving names of students who were inappropriately placed in her classroom and about which the special education department had information indicating that they were harmful to themselves or others. Tr. Vol. IV at 11, 104–05. Wytrwal testified that she was specifically asked by the board why these students had not been placed, and she told the board that the students had not been placed outside the district because Stickney would not allow it. Tr. Vol. IV at 12, 105. Wytrwal went on to explain that the special education department had had a few PET meetings on one student, which included an outside psychologist as well as other professionals from JBI, and the team had come to the consensus that the student needed to be placed outside the district immediately. Tr. Vol. IV at 105. Wytrwal testified that Stickney said he would overrule the team's consensus, and the meeting was postponed and reconvened at a later date. Tr. Vol. IV at 105. Wytrwal testified that she told the board that one person cannot override the PET consensus.[21] Tr. Vol. IV at

DeSimone that Wytrwal would like to come before the board and discuss issues relating to special education at the Middle School. Tr. Vol. V at 59. Under state law, a school board may go into executive session to discuss only certain matters. Tr. Vol. V at 73.

There was disagreement on whether the board changed rooms to start the executive session. Wytrwal testified that when the board went into executive session, it moved into a different room from that in which the public meeting took place. Tr. Vol. IV at 101. Hadiaris, DeSimone, and Booth testified that when the meeting adjourned and the board went into executive session, they did not move into another room. Tr. Vol. V at 27–28, 56–57, 81.

21. If there is a dissenting opinion, Wytrwal testified, a dissenting opinion report must be filed,

105. Wytrwal testified that she told the school board that the school was in direct violation of laws with regard to placements, pointing out that she had tried repeatedly to get two particular students placed, but that Stickney had drawn a bottom line that, for financial reasons, no one was going to be placed outside the school system. Tr. Vol. IV at 11, 66, 105. Wytrwal testified that she explained the school's responsibility with regard to these students and that anything could happen with these students, creating liability issues for the school. Tr. Vol. IV at 105. She testified that Stickney responded to her allegations at the school board meeting by asserting that legal guidelines had been followed. Tr. Vol. IV at 13.

Wytrwal testified that Hadiaris and DeSimone asked her most of the questions.[22] Tr. Vol. IV at 105. Wytrwal recalled that the board asked Stickney what he would have done in the situation where a parent had called him. Tr. Vol. IV at 106. Wytrwal testified that Stickney responded by saying he would not have taken the call. Tr. Vol. IV at 106. Wytrwal explained that at that, DeSimone "came right out of her seat" and said, "You wouldn't have taken the call? You would have let someone kill themself?" [sic] Tr. Vol. IV at 106. Stickney did not respond to this question. Tr. Vol. IV at 106. Wytrwal testified that Hadiaris talked about being a gatekeeper and that these students needed to be appropriately placed. Tr. Vol. IV at 106. Wytrwal testified that all members of the school board thanked her for coming forward and bringing this matter to their attention. Tr. Vol. IV at 43, 106.

### 2. The Administrators' Account

#### a. Mowles

Mowles testified that Wytrwal discussed her program and the students in her program. Tr. Vol. I at 15, 78. She said that Wytrwal was concerned about needing more resources for her students. Tr. Vol. I at 15, 78. She did not remember Wytrwal being critical of Stickney's conduct as director of the special education program, about the way the program was being run, or that the school was failing to comply with any state or federal regulations. Tr. Vol. I at 16, 80–81. Mowles testified that Wytrwal never discussed PET meetings in her presentation let alone allege that PETs were being predetermined. Tr. Vol. I at 81–82. She recalled there was very little discussion regarding Wytrwal's presentation. Tr. Vol. I at 83. Mowles testified that Wytrwal's presentation was quite technical and went over the heads of two board members. Tr. Vol. I at 82–83. However, the three board members who seemed to be following the presentation asked a few questions.[23] Tr. Vol. I at 83.

#### b. Goodness

Goodness recalled that Wytrwal's presentation to the school board followed her handout, but that he did not recall Wytrwal discussing special education. Tr. Vol. III at 8–9, 37. He said that Wytrwal's presentation dealt with students who were at risk yet were not covered under the special education guidelines—alternative education. Tr. Vol. III at 8, 38. He testified that Wytrwal did not mention her students. Tr. Vol. III at 9. Goodness testified specifically that Wytrwal did not criticize Stickney or the special education department in her presentation to the board. Tr. Vol. III at 9, 37. He testified that Wytrwal did not say IEPs were not being followed or that PETs were predetermined and that she never made reference to the failure of Saco Middle School to comply with state or federal law. Tr. Vol. III at 37.

#### c. Stickney

Stickney testified that Wytrwal made an academic presentation on the psychological needs of children, citing text and manuals. Tr. Vol. III at 64, 112. The presentation

and then the PET reconvenes to resolve the dissenting opinion. Tr. Vol. IV at 105.

**22.** Wytrwal testified that the board also asked her questions about IEPs and that Wytrwal explained to them what they are. Tr. Vol. IV at 13. Wytrwal then testified that she told the board that the school district was violating the IEPs of

some children by providing restrictive environments. Tr. Vol. IV at 13. Wytrwal testified that her special education program in the Saco Middle School could not meet the needs of these students. Tr. Vol. IV at 13.

**23.** The other two board members, Mowles testified, were dozing. Tr. Vol. I at 82–83.

related to the nature and needs of behaviorally impaired children. Tr. Vol. III at 112. Stickney did not recall whether alternative education was part of Wytrwal's presentation. Tr. Vol. III at 113. Stickney testified that he did not recall that Wytrwal was critical of anything at the meeting, including the special education program at Saco Middle School. Tr. Vol. III at 64, 116. He said that Wytrwal did not tell the board that the special education department was in violation of federal or state special education laws, that PET meetings were being predetermined, or that IEPs were not being followed. Tr. Vol. III at 115–16. He could not remember any board members asking Wytrwal questions, but said that some of the members of the school board were impressed by Wytrwal's presentation and made favorable comments when she had finished. Tr. Vol. III at 65, 116.

Stickney was angry when he left the school board meeting but his anger was not a result of any criticism of his department. Tr. Vol. III at 65, 122; Tr. Vol. IV at 13, 68–69. Stickney was angry because Wytrwal's presentation was off the topic of alternative education, which was supposed to have been the issue discussed, and her presentation inappropriately dealt with subjects outside her area of expertise. Tr. Vol. III at 114; LeBlanc Depo. at 65.

*d. Voci*

Voci testified that he thought there were two parts to Wytrwal's presentation to the school board. The first part described alternative education programs, and the second part was "real clinical," describing the type of students that were in the special education program and the different types of programs that could meet the needs of these students. Tr. Vol. III at 135, 164. He recalled that Wytrwal discussed her students in general terms, but that she did not mention names. Tr. Vol. III at 135. He said that Wytrwal did not criticize Stickney or the special edu-

cation program at the school board meeting. Voci testified that Wytrwal did not allege violations of laws or regulations or that IEPs were not being followed.[24] Tr. Vol. III at 135, 159–60. He said that Wytrwal did not suggest that some of her students had a behavioral problem that would render them unsuitable to attend Saco Middle School. Tr. Vol. III at 164.

*e. LeBlanc*

In February of 1992, Paulette C. LeBlanc worked as the curriculum coordinator for Saco School Union.[25] LeBlanc Depo. at 3; Tr. Vol. IV at 102. LeBlanc explained that Wytrwal wanted to share concerns about her program with the school board. At that time, the school board was doing a study on alternative education, but Wytrwal's presentation to the board had nothing to do with alternative education. LeBlanc Depo. at 23–24. LeBlanc testified that Wytrwal spent a good deal of time criticizing the fact that there were students in her program who were "ill placed" and who did not belong there. LeBlanc Depo. at 6–7, 19. LeBlanc testified that Wytrwal was concerned that in order to meet the students' needs, the school district should consider alternative placements. LeBlanc Depo. at 7, 21. LeBlanc sensed that there was a disagreement between Wytrwal and Stickney regarding whether certain students should be in the special education program. LeBlanc Depo. at 9. LeBlanc recalled that Wytrwal told the board that the placement of certain students in her program violated certain state or federal special education laws. LeBlanc Depo. at 7–8, 21. She testified that Stickney told the board that all of the students had valid IEPs. LeBlanc Depo. at 8.

*3. School Board Members*

*a. DeSimone*

DeSimone had very little memory regarding what had happened at the meeting. Tr.

**24.** Voci testified that a couple of times Stickney did not meet the reporting requirements of PET meetings and that Wytrwal brought this issue of untimely reporting to his attention. Tr. Vol. III at 138–140. Wytrwal raised the issue that this was a legal requirement. Tr. Vol. III at 140.

However, Wytrwal did not mention this deficiency at the board meeting. Tr. Vol. III at 140.

**25.** LeBlanc no longer works with the Saco School District and has since moved out of state. LeBlanc testified by videotape. Ex. J–1.

Vol. V at 28. DeSimone testified that she remembered that the subject matter of executive session was special education and not alternative education. Tr. Vol. V at 30, 35–36. She testified that she did not have any recollection regarding what was discussed after Wytrwal left the executive session.[26] Tr. Vol. V at 34.

### b. Lander

Leroy W. Lander, Jr. recalled attending a school board meeting in early 1992 at which a teacher discussed special education. Tr. Vol. V at 43. However, Lander had no recollection of a teacher appearing before the school board and telling the board that PET meetings were predetermined, in violation of state or federal special education laws. Tr. Vol. V at 44. Apparently he was one of the "dozers" referred to by Mowles.

### c. Booth

J. Haley Booth recalled that a special education teacher asked to meet with the school board in executive session. Tr. Vol. V at 49. Overall, Booth "didn't really think this was a very large event." Tr. Vol. V at 39. Booth thought the reason for going into executive session was that Wytrwal wanted to share some of her concerns on special education with the board. Tr. Vol. V at 50. Booth did not recall asking Wytrwal any questions, remarking that: "Quite frankly, some of the points I think were a bit too technical for me" and "I didn't pay enough attention [to her] to be truthful with you." Tr. Vol. V at 51, 52. Booth did, however, believe Wytrwal had indicated that the school was not in compliance with certain standards. Tr. Vol. V at 52. Booth testified that he thought this was a matter of importance and, in fact, that he had checked into the matter with Stickney to find out if the school district was in compliance with the legal requirements and that

Stickney had responded that, in his opinion, they were.[27] Tr. Vol. V at 52.

### d. Hadiaris

Hadiaris testified that during the executive session she remembered Wytrwal discussing her program and the types of students in her program. Tr. Vol. V at 63. She recalled that Wytrwal generally discussed students who did not fit within the guidelines of special education but who needed something other than a regular classroom placement. Tr. Vol. V at 63, 68. She thought Wytrwal was addressing the issue in terms of what should be done with these students. Tr. Vol. V at 63. Hadiaris agreed that from Wytrwal's comments, there was at least one individual who really could not best be served by being in her classroom. Tr. Vol. V at 68. Hadiaris testified

I remember [Wytrwal] stating, through the boxes on the handout, that there were specific guidelines in special education that allowed us to deal with those children within the special ed program, which allows us to offer services that are not available to kids not within the special ed guidelines, and that there were children that were not being served in the regular classroom that she had in her program that needed the structure of the type of out-of-classroom program for at least part of the day, and that they were kids that would best be served in an alternative ed program. And then [Wytrwal] discussed the types of issues that these kids addressed which were primarily behaviorally related problems.

Tr. Vol. V at 64.

Hadiaris recalled Wytrwal discussing a particular student having exhibited instances of violence towards another teacher or the principal and that because of his particular behavior, he had been placed in her class-

---

**26.** The Court found it more than passingly strange that a special education teacher would appear in an executive session before the school board by DeSimone's prearrangement and that DeSimone has no recollection of any subject matter discussed with her prior to that time and no recollection of what happened at the meeting.

**27.** On further questioning by Plaintiff's counsel, Booth recanted this testimony, stating that he

had not raised the issue regarding compliance with Stickney as a result of Wytrwal's presentation. Tr. Vol. V at 55, 56. Booth explained that, "Periodically, I try to check on things even though my expertise is not in that particular field ... I suppose I might have asked Mr. Stickney how things are going, something of that nature, as I did periodically." Tr. Vol. V at 55. The Court does not find the latter response credible.

room. Tr. Vol. V at 67. She said that she remembered that Voci described his altercation with this student and that she was concerned about this. Tr. Vol. V at 69. She recalled Wytrwal being asked, "Is this a problem for you to have this person in your classroom?", and that Wytrwal responded, "No, but an alternative ed program would allow us to deal with kids who fit within those guidelines one way and special ed students another way rather than mixing the two."[28] Tr. Vol. V at 67–68. She testified that the entire administration at Saco Middle School and the special education director agreed with Wytrwal's interpretation of the alternative education program and that it should be considered for budget. Tr. Vol. V at 71.

Hadiaris testified that Wytrwal did not tell the board that any violation of law was taking place at Saco Middle School in special education. Tr. Vol. V at 80, 81. She did not recall Wytrwal being critical of Stickney or the way special education operated, or Wytrwal asserting that students were not being handled properly under special education law or that PET meetings were being predetermined. Tr. Vol. V at 64.

At the meeting, Hadiaris saw Voci and Goodness exchanging glances and sensed that something was amiss. Tr. Vol. V at 62. After the meeting, Hadiaris went downstairs into their office and asked Voci and Goodness why they were looking at each other like that. Tr. Vol. V at 62. And they responded that because Wytrwal had done a very good

job in the meeting and the board seemed very impressed, it was going to be hard for the board to understand their recent decision not to recommend her contract for renewal. Tr. Vol. V at 62, 66–67.

### F. After the School Board Meeting

After the meeting, no one ever mentioned the presentation to Wytrwal. Tr. Vol. IV at 67. Nevertheless, Wytrwal expected that the school district would start looking into different placements for the students. Tr. Vol. IV at 107. Wytrwal testified that after the February 11 school board meeting, her relationship with both Goodness and Voci changed.[29] Tr. Vol. IV at 15.

On February 13, 1992, a PET meeting took place which was attended by Stickney, Wytrwal, Voci, two regular classroom teachers, and the student's parent. Tr. Vol. III at 102–103, 160. At the meeting, the regular education teachers expressed frustration with the student and some concern about not having enough support from Wytrwal. Tr. Vol. III at 104. Thereafter, there was some heated discussion between the regular classroom teachers and Wytrwal regarding the student's educational plan.[30] Tr. Vol. III at 104. At the conclusion of the meeting, it was decided that the student would stay in the current placement and that Wytrwal was to work more closely with the teachers to help them with the student's behavioral plan. Tr. Vol. III at 105. Stickney testified that thereafter, Wytrwal stormed out of the meeting and did not speak to him.[31] Tr. Vol. III at

---

28. This comment of Hadiaris is significant because it establishes that Wytrwal was telling the board that there were students in her classroom who did not belong there, that they needed another placement. Hadiaris testified that Wytrwal was making a proposal for a program that was not in existence at that time. Tr. Vol. V at 70.

29. Wytrwal testified that the following day, Goodness came down to the faculty room and asked her to step outside. Tr. Vol. IV at 14. Wytrwal then testified that Goodness told her that she shouldn't have taken on her boss until she got tenure. Tr. Vol. IV at 14, 69, 110–11. Goodness denied telling Wytrwal this. Tr. Vol. III at 43.

Wytrwal testified that the day after Goodness had spoken to her, she saw him in the office and while she was speaking to him, he turned around, went into his office, and closed the door. Tr. Vol. IV at 15, 108. Wytrwal recalled that

from that point on, it was like "I had the plague" and in her opinion this was a direct result of the school board meeting. Tr. Vol. IV at 15, 108. After the school board meeting, Wytrwal testified that Voci and Goodness no longer called her out of her classroom to assist with behavioral problems. Tr. Vol. IV at 109.

30. In Stickney's opinion, Wytrwal acted inappropriately by attacking the other teachers at the PET meeting. Tr. Vol. III at 106–07. Stickney testified that this was a problem because the parent was present and the situation became "very contentious." Tr. Vol. III at 104. Voci testified that he came to the meeting late; however, when he walked into the room, the meeting was about to blow up. Tr. Vol. III at 160.

31. Goodness recalled that on February 13, 1992, two days after the school board meeting, he observed Wytrwal's behavior after a PET meet-

105. Stickney testified that he made up his mind at that point not to recommend Wytrwal for a continuing contract.[32] Tr. Vol. III at 107.

After the PET meeting, Stickney discussed with Voci his dissatisfaction with what had occurred at the PET meeting, and they concluded that it would be in the best interests of all involved to put his concerns in writing. Tr. Vol. III at 68, 107–08, 120, 131. On February 27, 1992, Stickney sent a letter to Wytrwal, putting in writing for the first time, his negative criticisms of her.[33] Tr. Vol. III at 67, 105; Ex. J–10. After receiving the letter, Wytrwal took it to Jeffrey Wilder, a science teacher at Saco Middle School and the union representative for the building, for assistance in getting the letter removed from her personnel file.[34] Tr. Vol. III at 175–76. Wytrwal complained to Mowles about the truthfulness of the letter, and the letter was reviewed. Tr. Vol. IV at 28–29; Tr. Vol. III at 108; Tr. Vol. I at 32, 90; Tr. Vol. III at 178. In an initial attempt to deal with the matter, Mowles and Wilder agreed that Peter Flaherty, the assistant principal at another school in the Saco School District, should serve as mediator. Tr. Vol. I at 90; Tr. Vol. III at 178. No mutually satisfactory resolution was reached at that mediation session. Tr. Vol. I at 91; Tr. Vol. III at 178–79.

Wytrwal's complaint regarding the letter went back to Mowles who convened a meeting with Wytrwal, Stickney, and Wilder to discuss the letter. Tr. Vol. IV at 27; Tr. Vol.

III at 107, 179, 188. At the end of the meeting Mowles instructed Stickney that the letter was to stay out of Wytrwal's personnel file, Tr. Vol. III at 179, and that he was to rewrite the letter and give a copy of the redraft to Wilder and Wytrwal.[35] Tr. Vol. IV at 28; Tr. Vol. III at 180–81. Unwilling to change anything in the letter, Stickney never redrafted it. Tr. Vol. III at 109, 181–82; Tr. Vol. IV at 28; Tr. Vol. I at 36.

Less than one month later, Stickney wrote another letter to Wytrwal regarding her behavior at a staff meeting. Ex. J–11. Apparently, Stickney was holding a meeting of the Middle School special education teachers to review some procedures for the special education department when Wytrwal entered the meeting and said something to the effect that the union had advised her that teachers were not to participate in any work-related activities after a certain time of day. Tr. Vol. III at 110. With the designated hour soon approaching, Wytrwal told Stickney that she was not participating in the meeting after that time. Tr. Vol. III at 110. Stickney explained that the reason for this letter was that he was "trying to change some of [his] social interactions to take a leadership role which maybe [he] had not shown in the past and [he] felt it was time ... to take that direction." Tr. Vol. III at 69.

## G. Wytrwal Notified of Nonrenewal

Wytrwal learned that her contract would not be offered for renewal on April 9, 1992.

ing. Tr. Vol. III at 40–41. Goodness testified that when Wytrwal came out of the meeting, she appeared very angry, and she said, "That fucking Gold Team." Tr. Vol. III at 41, 162–63. The Gold Team was made up of the regular classroom teachers that were meeting as part of the PET for that particular student. Tr. Vol. III at 41.

After the meeting, Voci testified that the regular classroom teachers explained to him what had happened and that Wytrwal had blamed them for the student being unsuccessful. Tr. Vol. III at 161. One of the regular education teachers told Voci that the student was mainstreamed without any support from Wytrwal. Tr. Vol. III at 162.

32. This statement is contradicted by Stickney's testimony that in the fall of 1991, he made up his mind that Wytrwal should not be renewed. Tr. Vol. III at 117.

33. Stickney testified that he knew that writing the February 27 letter would support his position that Wytrwal's contract should not be renewed. Tr. Vol. III at 120. Stickney explained that in an effort to counterbalance the positive comments Wytrwal had received from the board members, he wanted to document the fact that everything was not positive with respect to Wytrwal. Tr. Vol. III at 117, 121–22.

34. Wilder testified that he inquired if Voci was responsible for, or had any information regarding, the letter, and Voci responded, "No." Tr. Vol. III at 176. Wilder then asked Stickney if it was his letter, and he responded, "No, it's not mine, Jeff." Tr. Vol. III at 177.

35. Mowles testified that she considered this letter in her decision whether to nominate Wytrwal for tenure. Tr. Vol. I at 34, 91.

Tr. Vol. IV at 29. That morning, Wytrwal received a note in her mailbox requesting she go to Voci and Goodness's office on her lunch break. Tr. Vol. IV at 30, 113. When she arrived, Voci handed her an evaluation that he had completed, and then he informed her that he had recommended to Mowles that her contract not be renewed.[36] Tr. Vol. IV at 30, 48, 114; Tr. Vol. III at 42; Ex. J–8. Wytrwal testified that Voci and Goodness asked her if she wanted to discuss anything regarding the nonrenewal of her contract, Tr. Vol. IV at 40–41, and then Wytrwal testified that Voci leaned back in his chair with his feet up on the desk, put his hands behind his head, and said, "We hate to see a seventeen-year career down the tubes, but I guess your's is." [37] Tr. Vol. IV at 30, 114–15. Wytrwal testified that she was shocked when she learned that she was not going to be renewed. Tr. Vol. IV at 43. A few days later, Mowles wrote a letter to Wytrwal informing her that she would not be continued as a teacher in special education at the Saco Middle School.[38] Tr. Vol. I at 10; Ex. J–9.

## II. DISCUSSION

### A. 42 U.S.C. § 1983

The law controlling the violation of section 1983 is quite clear. First, plaintiff must show that her conduct was constitutionally protected and that this conduct was a "substantial" or "motivating" factor in the Board's decision not to rehire her. *Mt. Healthy City School District Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). It need not be the sole reason for the decision, however. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50

L.Ed.2d 450 (1977). After a plaintiff has made the requisite showing, the burden shifts to the defendant to establish, by a preponderance of the evidence, that the same decision respecting the plaintiff's employment would have been made even in the absence of the protected conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Acevedo–Diaz v. Aponte,* 1 F.3d 62, 67 (1st Cir.1993).

In this case, Wytrwal claims that her termination was a result of the constitutionally protected conduct she engaged in at the school board meeting. Wytrwal's presentation at the school board meeting was on a matter of public concern, and her interest in expressing her concerns far outweighed the school board's interest in discouraging such expression. *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). As such, Wytrwal's speech was constitutionally protected. *See Southside Public Schools v. Hill,* 827 F.2d 270 (8th Cir.1987).

The Court does not find, as Defendants suggest, that Wytrwal's presentation to the school board was benign. The Court is satisfied that Wytrwal told the school board at the February 11 meeting that Saco Middle School was violating special education laws by failing to appropriately place students. In addition to Wytrwal's testimony, this finding is supported by the direct testimony of LeBlanc and Booth [39] and inferences drawn from the testimony of Mowles, Voci, DeSimone, and Hadiaris. The Court is unable to credit the testimony of those administrators and school board members who claimed that Wytrwal did not allege that there were violations of law taking place in the special education department at Saco Middle School.

---

36. Wytrwal testified that she reviewed the evaluation and was surprised. Tr. Vol. IV at 114. Goodness testified that the year-end evaluation was an accurate synopsis of Wytrwal's performance during the second year. Ex. J–8; Tr. Vol. III at 42.

37. Wytrwal did not state in her deposition that Voci put his feet up on his desk, his hands behind his head and made this statement. Tr. Vol. IV at 39.

38. Mowles testified that if it is recommended that a teacher not be continued, the final deci-

sion rests with her. Tr. Vol. I at 12. It is Mowles's opinion that the tenure decision is probably the most important decision that a superintendent makes, and it is her practice to err on the side of favoring the students, which means moving the teacher on, rather than keeping the teacher if she has any questions about that teacher's capabilities. Tr. Vol. I at 51–52.

39. The Court was struck by Booth's initial unreflective frankness about Wytrwal's comments at the board meeting.

Without question Wytrwal and Stickney disagreed on the issue of whether certain students should be placed outside the school district and this was played out, to some degree, during the executive session. The Court concludes that the testimony at trial of the administrators and school board members was fabricated in an attempt to cover up what really occurred at the board meeting.[40] Tr. Vol. I at 84, 91–92; Tr. Vol. III at 40, 43, 118, 163. Although participation in protected conduct and subsequent adverse employment action does not, without more, satisfy the *Mt. Healthy* test, *Cromley v. Bd. of Educ.*, 17 F.3d 1059, 1068 (7th Cir.1994); *Cox v. Miller County R–I School Dist.*, 951 F.2d 927, 932 (8th Cir.1991), here the Court draws the inference, despite testimony to the contrary, that Wytrwal's presentation to the board was a motivating factor in the decision not to renew her contract.

In reaching this conclusion, the Court also relies on the events that led up to Wytrwal's appearance at the school board meeting. First and foremost, the Court finds support for its conclusion in the meeting that Wytrwal had met in her classroom with DeSimone at which Wytrwal told DeSimone that the school was violating special education laws. As a result of this serious allegation, DeSimone arranged for Wytrwal to voice her concerns during an executive session of the school board. DeSimone's complete lapse in memory, on this point in particular, is highly suspect. The Court has difficulty believing that DeSimone, after arranging the event, is without *any* memory whatever regarding what Wytrwal's concerns were that led her to arrange for Wytrwal to speak at the executive session. It becomes even more troubling when the Court is asked to believe that a teacher speaking in executive session is a "highly unusual" event.

The Court also relies on the handout Wytrwal distributed at the board meeting. The handout is entitled: "IMPACT OF NOT HAVING PROGRAMS THAT ARE DESIGNED SPECIFICALLY TO MEET THE NEEDS OF EMOTIONALLY/BEHAVIORALLY IMPAIRED." Ex. D–114. This title suggests that the special education program was failing to meet all of the students' needs. If Saco Middle School could not meet the students' needs, in Wytrwal's opinion, the students should have been placed outside the district. The failure to properly place students is what Wytrwal claims violated special education laws.[41] In addition, the handout itself describes the symptoms and behaviors of students in Wytrwal's classroom as "rang[ing] from acute to chronic to psychiatric." Ex. D–114 at 3. Two pages later, the handout labels the category of students with psychiatric problems as needing "out of district placement." Ex. D–114 at 6. The Court concludes from this handout that Wytrwal clearly intended to tell the board that there were students in her classroom who should be placed out of the district. From the direct and circumstantial evidence that shows that Wytrwal told the school board that students were improperly placed in violation of special education laws, the Court infers that these comments were a substantial and motivating factor in the decision not to renew her contract. Accordingly, the Court finds that Wytrwal has proved her *prima facie* case.

■ At this point, the *Mt. Healthy* analysis allows Defendants to show that the same decision would have been made absent the constitutionally protected activity. Defendants claim that there were a number of other problems with Wytrwal that supported the decision not to renew her contract. Most significantly, Defendants produced evidence that Wytrwal's functionally nonexistent working relationship with Stickney, the special education director, led the administrators not to nominate Wytrwal for renewal. One of the factors that Mowles considered in the renewal decision was Wytrwal's relationship

---

**40.** The Court notes that one piece of the puzzle necessary to credit the administrators' version of the events: that is, why the board would have gone into executive session to have Wytrwal discuss alternative education, an issue that had already been raised and discussed in the public session makes absolutely no sense.

**41.** The Court does not pass judgment on the accuracy of Wytrwal's allegations against the special education department. That issue is not raised in this case.

with Stickney.[42] Tr. Vol. I at 74. The Court cannot disregard that the evidence unquestionably establishes that from the first month she taught at Saco, Wytrwal had fundamental problems with Stickney. Tr. Vol. III at 59, 145. These problems apparently stemmed from basic philosophical differences about special education which over time turned into an irreparable personality conflict. The problems between Wytrwal and Stickney necessarily impaired the ability of the special education department to function as a team.[43] These problems led to Stickney's conclusion, in the fall of 1991, that he could not continue to work with Wytrwal.[44] Tr. Vol. III at 117–18.

Although the final decision was not made until April of 1992,[45] Tr. Vol. I at 73; Tr. Vol. III at 10, 22, 145, the administrators concluded prior to the February 11 school board meeting that Wytrwal's contract renewal was in serious trouble. The administrators testified that Wytrwal's second year was markedly different from her first. Tr. Vol. I at 63; Tr. Vol. III at 17. In addition to the problems with Stickney, the administrators claim that there were a number of other reasons why they could not support the decision to renew Wytrwal's contract including: concerns that she was not willing to let her students go into other classrooms or lend her expertise regarding a student to the regular classroom teachers, Tr. Vol. I at 68; concerns about her ability to share space in the special education classroom for other specialists, such as school psychologists and social workers,[46] Tr. Vol. I at 70; concerns about

42. Mowles testified that by December 1991–January 1992, she understood that Wytrwal's relationship with Stickney had deteriorated beyond what it had been the previous year. Tr. Vol. I at 74–75. Mowles testified that she concluded this from the fact that the first year, Wytrwal and Stickney had heated meetings, and during the second year, they had no meetings or interaction at all. Tr. Vol. I at 75.

43. Mowles remembered a conversation that she had with Stickney in December 1990 relating how successful she thought the holiday party was and, for the first time, Stickney expressed concerns to her regarding his relationship with Wytrwal. Tr. Vol. I at 60. Mowles thought Stickney felt that Wytrwal did not follow directions and that he was her boss and that she did not really listen to suggestions. Tr. Vol. I at 60–61. The Court thinks this resulted from Stickney not acting effectively as an administrator and his initial failure to make any attempt to straighten the situation out anytime in the first year. Although Mowles testified that she did not think that Stickney entirely blamed Wytrwal for the problems, he did not take any type of leadership role in an attempt to correct or work out the problem. He simply let it fester as it developed from heated discussions to an absence of any interaction between them. Then he became frightened that Wytrwal might be on the road to becoming a challenge to the authority he had, until then, failed to show the gumption to use.

44. Stickney testified that there were numerous reasons why he concluded that Wytrwal's contract should not be renewed. Tr. Vol. III at 86. One of the reasons was her lack of ability to work with him. Tr. Vol. III at 86. Another reason, Stickney testified, was Wytrwal's lack of cooperation with social workers and psychiatric examiners. Tr. Vol. III at 86. In addition, Stickney testified that Wytrwal was not working cooperatively with regular education teachers for the students who were mainstreamed. Tr. Vol. III at 86. Stickney testified that in approximately February of 1992, other teachers began to express concerns to him regarding Wytrwal. Tr. Vol. III at 102.

45. Goodness testified that in April, he discussed with Voci whether Wytrwal was meeting the needs of her students during the second year, and he concluded that the program was not meeting the needs of the special education students. Tr. Vol. III at 39.

46. Wytrwal testified that during the second year, she would not let Arnold Davis, the social worker, into her classroom to conduct group meetings because he did not meet with all of the students and he permitted behavior during the group meetings that was unacceptable in her classroom. Tr. Vol. IV at 71–72, 73–74; Tr. Vol. III at 97. Wytrwal was concerned that her classroom not be a place where the students thought they could engage in these types of behaviors. In essence, Wytrwal did not want the things that happened in group meetings to happen in her classroom. Tr. Vol. IV at 73. The Court was struck by one example of Davis' lack of control: Davis at one time was tied up by his students on the playground. Tr. Vol. III at 165; Tr. Vol. III at 199–200.

Stickney testified that Wytrwal and Davis did not work together, as he had expected they would, in preparation of behavior modification programs for students. Tr. Vol. III at 96. Stickney explained that during the first year, there was constant conflict between Wytrwal and Davis. Tr. Vol. III at 96–97. He testified that he did not see any improvement in this relationship during the second year that Wytrwal was at Saco Middle School. Tr. Vol. III at 99.

whether Wytrwal was implementing, to the extent necessary, a working relationship with other specialists who played an integral part in her students' education, Tr. Vol. III at 145; concerns about Wytrwal's time out of classroom; concerns about the increased number of student disciplinary referrals; and concerns over Wytrwal's ability to manage her students. Tr. Vol. I at 71–72; Tr. Vol. III at 19, 24, 145–46. These concerns were ongoing throughout the second school year, arising before the school board meeting.[47]

In reviewing the testimony, the Court has come to the conclusion that the problems Wytrwal encountered during the second year resulted from the combination of two factors: a change in the number and type of students in her classroom and changes in her temperament as a result of her mental illness.[48] Some problems which made Wytrwal's job more difficult the second year resulted from the increased number and type of students, but essentially these were beyond her control. Tr. Vol. III at 197, 202. For example, Wytrwal's frequent trips out of the classroom were noted with concern by all the administrators.[49] Tr. Vol. I at 63; Tr. Vol. III at 24; Tr. Vol. III at 111–12. During the second year, Wytrwal left her classroom more frequently because the nature of the problems her students had were more serious. Tr. Vol. IV at 21; Tr. Vol. III at 196. In addition to her class doubling in size, it was necessary for Wytrwal to telephone, and receive calls from, parents, probation officers, and outside agencies to which Wytrwal was responsible for providing school work for absent students. Tr. Vol. IV at 22–23. Another cause of Wytrwal's absence from the classroom was that Voci and Goodness would call her in to consult on any matter that arose in the general student population that could be considered behavioral. Tr. Vol. IV at 23.

Due to the changed goals of the special education program, Wytrwal's role expanded

47. Mowles testified that because of comments she had heard from Goodness and Voci, she had concerns with respect to whether or not to offer Wytrwal renewal of her contract as early as October of 1991. Tr. Vol. I at 36–37, 67. By the late fall, Mowles knew that there was a serious problem with respect to Wytrwal and that there was a possibility that Wytrwal would not have her contract renewed. Tr. Vol. I at 37–38, 99–100. Mowles testified that in December, she was clearly leaning toward nonrenewal, and after not observing any changes in Wytrwal's performance or receiving any reports of changes from administrators, she felt, by the end of January, that it was "very doubtful" that Wytrwal would be nominated for continued renewal. Tr. Vol. I at 74.

Goodness testified that before Christmas of 1991, he had no reason to believe that Wytrwal's contract renewal was in serious jeopardy. Tr. Vol. III at 11. Starting in the end of December, Goodness had ongoing discussions regarding Wytrwal with Voci and Mowles prior to making a final decision. Tr. Vol. III at 4, 12 23. Goodness explained that during the second year, he saw some problems but that he had high hopes that Wytrwal would be able to turn it around. Tr. Vol. III at 21. Goodness testified that although he did not recall the exact date, about the time of the board meeting there was serious doubt regarding Wytrwal's contract renewal. Tr. Vol. III at 10. Goodness recalled that there were serious concerns expressed with regard to Wytrwal's renewal prior to the February 11 meeting, but it was not until sometime after February 11 that he became aware that Wytrwal's contract renewal was in serious jeopardy. Tr. Vol. III at 44.

Voci testified that he made a tentative decision not to continue Wytrwal's contract sometime between Thanksgiving and Christmas of 1991. Tr. Vol. III at 134, Tr. Vol. III at 155. Voci testified that from Thanksgiving time on, he thought Wytrwal's contract was in serious risk of not being renewed. Tr. Vol. III at 163–64.

48. The administrators did not attempt to distinguish between these two causes of Wytrwal's problems. Mowles testified that during the second year, Wytrwal did not seem positive about her students and that she always seemed "harried or harassed." Tr. Vol. I at 63. Stickney testified that Wytrwal's mood changed from the first year to the second. Tr. Vol. III at 111. "The simplest way is to say the first year, she moved quickly and was very animated. During the second year, that animation was at a level of not so hectic.... It was nervous. The activity was not necessarily related to the project that was going on ... [her behavior] was frenetic as opposed to animated." Tr. Vol. III at 111. Voci testified that Wytrwal's moods seemed "scattered all over the building"—"running around, putting out fires." Tr. Vol. III at 154. Even LeBlanc observed a change in Wytrwal's behavior between her two years at Saco Middle School. LeBlanc Depo. at 13–14.

49. Voci found Wytrwal out of her classroom frequently, either in the smoking lounge, in the secretary's office waiting for the phone, or talking with Goodness. Tr. Vol. III at 154.

the second year. Stickney testified that as Wytrwal's role was expanded, it became more difficult for her to function. Tr. Vol. III at 101. It was the expectation of the administration that Wytrwal would assist students in being mainstreamed; particularly, that she would ensure that they had a comprehensive plan: a behavior plan and an academic plan. Tr. Vol. III at 152. The administration's expectations were not fulfilled. Wytrwal had difficulty working with the other specialists involved with her students, and the transition of her students into the mainstream was not accomplished in the way the administration had hoped. The Court concludes that these problems resulted mainly from changes in her temperament.

The administrators' perceptions about the difficulties they observed Wytrwal experiencing during the second year, and the Court's conclusion about the reasons for the changes, are buttressed by the testimony of Dr. Robert F. Savadove. Dr. Savadove is a clinical psychiatrist who has been involved with treating Wytrwal for approximately fourteen years. Tr. Vol. II at 4. Although Savadove is not Wytrwal's primary therapist, he is a pharmacology consultant for Deborah Slavin, a licensed clinical social worker and Wytrwal's primary therapist. Tr. Vol. II at 3, 28. Savadove testified that Wytrwal's current psychiatric diagnosis is schizoaffective disorder, also referred to as "manic-depressive disorder." Tr. Vol. II at 4. Schizoaffec-

tive disorder is both a thinking disorder and a mood disorder; however, over the years Savadove's diagnosis has leaned more toward the mood component. Tr. Vol. II at 4. Savadove explained that Wytrwal's schizoaffective disorder is of the bipolar type; that is, it has highs and lows. Tr. Vol. II at 29. Wytrwal's illness goes through cycles of these highs and lows. Tr. Vol. II at 6, 30. Practitioners do not attempt to cure a patient with schizoaffective disorder; rather, the attempt is to control the symptomatology so that the person can function in day-to-day life. Tr. Vol. II at 9.

Slavin's notes from May and June of 1991 indicate that Wytrwal was doing extremely well. Tr. Vol. II at 39, 42–43; Exs. D–125, D–126. This reinforces the evidence that Wytrwal's first year at Saco Middle School was a successful one. Slavin's notes from the beginning of the second year indicate that Wytrwal was still doing well. Tr. Vol. II at 46; Ex. D–127. However, between September and November of 1991, Wytrwal was developing symptoms of mood disorder.[50] Tr. Vol. II at 77–78. Savadove testified that he would not be surprised if someone described Wytrwal as being almost two different people from the first year to the second. Tr. Vol. II at 80. Savadove's notes indicate that Wytrwal was experiencing cycling of highs and lows from November 8, 1991, through February 7, 1992.[51] Tr. Vol. II at 126. The Court concludes that Wytrwal's

**50.** In mid-October 1991, Slavin's notes reflect that Wytrwal was beginning to experience a "rather insidious onset of increased irritability, restlessness, increased suspicion, intrusive psychotic thoughts of which she is acutely aware." Ex. D–128; Tr. Vol. II at 49. The notes also refer to "a creepy-crawly sensation," which, along with restlessness, is a common medication side effect. Tr. Vol. II at 54. Savadove testified that at that time, he prescribed a change in medication in an effort to eliminate or reduce these side effects. Tr. Vol. II at 54–55.

Notes dated October 17, 1991, reflect that Wytrwal told Slavin that because of her restlessness, she was out of the classroom every few minutes. Tr. Vol. II at 56; Ex. D–129. The notes reflect the fact that Wytrwal was concerned that her restlessness was affecting her performance in the classroom. The notes continue, "She was having trouble concentrating and is concerned that her behavior will soon be obvious to the kids." Ex. D–129. Savadove testified that during this time, the restless feeling was a rather severe drug side

effect. Tr. Vol. II at 60. The notes from October 21, 1991, indicate that Wytrwal's "mental status today is hypomanic." Ex. D–130. The notes from November 8, 1991, reflect an urgent medical-psychiatric consultation with both Savadove and Slavin. Tr. Vol. II at 66; Exs. D–130, D–131. The notes state that she is doing her work but does not know how well she is doing her work, "she has been increasingly irritable," and that her depressive condition is noticed by others. Tr. Vol. II at 75.

**51.** Notes from November 14, 1991, reflect that "Wytrwal's mood is quite stable now." Ex. D–132. Notes from November 25, 1991, indicate that Wytrwal "crashed" or went into a depressed state after her high. Ex. D–132; Tr. Vol. II at 82. Savadove's notes of February 7, 1992, indicate that he had an office visit with Wytrwal and Slavin and, at that time, Wytrwal described her mood as being all over the place. Ex. D–132.

psychiatric condition was not deteriorating, but, rather that she was going through a characteristic period of cycling and experiencing some side effects from the adjustment of her medication. Tr. Vol. II at 117.

The Court found Dr. Savadove's clinical insight helpful in providing support for the changes that the administrators testified were apparent in Wytrwal's behavior during the second year. The Court finds that there were significant reasons, wholly apart from her presentation at the school board meeting, which led the administrators to conclude that Wytrwal's contract should not be renewed. The problems arose well in advance of the school board meeting and although no final decision was made prior to the board meeting, there certainly was serious doubt about her contract renewal. Therefore, the administrators would not have offered Wytrwal a continuing contract even if she had not made the presentation at the February 11 school board meeting. Because Defendants have met their burden, the Court concludes that Wytrwal does not prevail on her section 1983 claim.

### B. Maine Whistleblowers' Protection Act

■ Under the Maine Whistle Blowers Protection Act, an employer may not discriminate against any employee because:

The employee, acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

26 M.R.S.A. § 833(1)(A). To prevail on a claim under this statute, Wytrwal must first establish a *prima facie* case of reprisal, which requires that she show that (1) she engaged in activity protected by the statute; (2) she was the subject of adverse employment action; and (3) there was causal link between the protected activity and the ad-

verse employment action. *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me.1991). Because the elements of this tripartite test are essentially the same as those required to establish a *prima facie* case under section 1983, the Court finds, for the reasons discussed above, that Wytrwal has met this standard. With Plaintiff's *prima facie* case established, however, this Court has been unable to find any Maine case law on what burden Defendants bear.

■ Citing *Muehlhausen v. Bath Iron Works*, 811 F.Supp. 15, 19 (D.Me.1993), Defendants contend that this statutory claim is analyzed according to the procedures applicable to other types of retaliation claims under Title VII.[52] The Court has reviewed similar whistleblower statutes in other states and found that, generally, courts have applied the federal standards arising under Title VII case law to the state whistleblower protection statute. *Rosen v. Transx Ltd.*, 816 F.Supp. 1364, 1367–68 (D.Minn.1993) (Minnesota's whistleblower statute); *Phipps v. Clark Oil & Refining Corp.*, 408 N.W.2d 569, 572 (Minn.1987) (Minnesota's whistleblower statute); *Melchi v. Burns International Security Services, Inc.*, 597 F.Supp. 575, 581 (E.D.Mich.1984) (construing Michigan Whistleblowers' Protection Act); *Kennedy v. Guilford Technical Community College*, 115 N.C.App. 581, 448 S.E.2d 280, 281–82 (1994) (discussing North Carolina's whistleblower statute); *LaFond v. General Physics Services Corp.*, 50 F.3d 165 (2d Cir.1995) (despite the absence of cases setting forth the elements of a whistleblower claim under Connecticut whistleblower statute, court affirmed district court's application of *McDonnell Douglas* standard); *see also Stevens v. St. Louis University Medical Ctr.*, 831 F.Supp. 737, 741–42 (E.D.Mo.1993) (in the absence of cases setting forth the elements of a whistleblower claim under Missouri law, court applied *McDonnell Douglas* standard); *Crosby v. State Dept. of Budget and Finance*, 76

---

**52.** The Court is perplexed as to what standard Plaintiff thinks should apply to her whistleblower claim. Plaintiff seems to suggest that proof of the *prima facie* case alone is sufficient to prevail on the Maine whistleblower claim. In noting the differences in the standard of proof between section 1983 and the Whistleblower statute Plaintiff

states "under the Whistleblower statute the defendant cannot escape liability by proving that the plaintiff would have been discharged even in the absence of protected conduct." Plaintiff's Post–Trial Brief (Docket No. 45) at 4. Plaintiff later argues evidence to establish pretext.

Hawai'i 332, 876 P.2d 1300, 1310 (1994). Because the goals of Title VII and the Maine Whistleblower Protection Act are similar in that they both seek to "protect the integrity of the law by removing barriers to employee efforts to report violations of the law," *Melchi*, 597 F.Supp. at 581, the Court will apply the shifting burdens developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■■■ Under *McDonnell Douglas*, its progeny, and Maine law, the employee has the initial burden of establishing a *prima facie* case. Wytrwal having already made this showing, the burden shifts to the employer to rebut the presumption of discrimination by producing evidence that the employer made the questioned employment decision for a legitimate reason. The employer's explanation of its actions must be "clear and reasonably specific." *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. If the employer meets its burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the factfinder that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *Id.* at 255, 101 S.Ct. at 1094–95. Pretext may be demonstrated either by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," *Id.* at 256, 101 S.Ct. at 1095, or by reliance on the evidence comprising the prima facie case coupled with disbelief of the reasons put forward by defendant, *St. Mary's Honor Ctr.*, —— U.S. at ——, 113 S.Ct. at 2749.

Defendants have presented persuasive evidence that Wytrwal was discharged for reasons other than her board presentation. Although Defendants have failed to show written documentation establishing any problems with Wytrwal prior to the school board meeting, the Court is satisfied that this is because, under state law, they are not required to create any documentation as a basis for a decision not to renew a probationary teacher. Tr. Vol. III at 169. These problems occurred prior to, and independent of, any concern about her presentation at the school board meeting. Accordingly, Defendants have satisfied their burden.

■■■ Wytrwal alleges that Defendants' reasons for not renewing her contract are pretextual, pointing out the inconsistency between her written evaluations and the administrators' testimony regarding her performance during the second year. Specifically, Wytrwal alleges that the reasons stated for her nonrenewal did not exist at the time the evaluations were completed, but that the proffered reasons were concocted after the fact to justify the decision that was made entirely as a result of Wytrwal's criticisms to the school board. Furthermore, Wytrwal suggests that Stickney's written criticism of her immediately following the board meeting further supports her conclusion of pretext.

Without question, Wytrwal's evaluations reflected that the administrators were more than satisfied with her performance. There were two classroom observation evaluations done on Wytrwal during the 1990–91 school year.[53] Exs. J–3, J–4; Tr. Vol. I at 22, 24; Tr. Vol. III at 8. On both evaluation forms, Wytrwal received highest marks, that is, she "exceed[ed] expectations" in all but one category. Tr. Vol. I at 22. In the final category, she received a mark of "meets expectations" for effective performance.[54] Tr. Vol. I at 22.

---

**53.** A certain number of classroom observations and evaluations are required by the teacher's contract and in completing evaluation forms, supervisors should include positive as well as negative comments. Tr. Vol. III at 141–42; Tr. Vol. I at 54. A classroom observation evaluation represents a snapshot of a moment in time and unless the supervisor had seen a problem in the classroom during his observation, the problem would

not be included in the evaluation. Tr. Vol. III at 19–20, 140. Final evaluations are generally used for pointing out areas needing improvement. Tr. Vol. III at 19–20.

**54.** Stickney testified that he did not observe any problems in Wytrwal's classroom prior to April of 1991. Tr. Vol. III at 52, 57. Stickney testified, however, that there were problems with

Stickney completed an end-of-the-year evaluation on April 11, 1991. Ex. J–6. On this evaluation form, he rated Wytrwal as meeting or exceeding expectations in all areas and did not include any criticisms. Ex. J–6. In the section designated for comments, Stickney wrote: "Students in the program have shown not only academic growth but have improved with social and emotional skills." [55] Ex. J–6. The administrators admit that these were excellent evaluations and that Wytrwal's first year was successful.

During the second year, Goodness completed a classroom observation evaluation, rating Wytrwal with the highest marks on December 19, 1991. Tr. Vol. III at 8; Ex. J–5. In the section designated for comments, Goodness wrote: "She has in the past and continues to be a positive influence on these young people's lives." [56] Ex. J–5. Another classroom observation evaluation was completed in early April 1992 rating Wytrwal's performance as good. Ex. J–7. Voci completed a year-end evaluation on April 9, 1992, designating a number of areas in which improvement was needed.[57] Ex. J–8; Tr. Vol. I at 87.

The administrators all agreed that if a probationary teacher was getting off-track, it was part of their responsibility to let the teacher know about the problem and try to work with that teacher to get him or her back on track. Tr. Vol. I at 9–10; Tr. Vol. III at 3, 7, 142. One of an administrator's primary responsibilities, Goodness opined, is to identify problems for teachers so that the problems can be remedied before the time of renewal. Tr. Vol. III at 7. The administrators agreed that if any problem rose to the level of a probationary teacher getting off track, that fact would be indicated in an evaluation. Tr. Vol. I at 20, 94; Tr. Vol. III at 142. Despite what the administrators testified, no one followed this procedure by using the evaluations as a way to include constructive criticisms and the Court concludes that the evaluations served no meaningful purpose. Although the administrators did not confront Wytrwal, either in writing or orally, to point out the problems as deficiencies in her performance, the administrators did discuss the problems with Wytrwal as they arose. During the second year, Goodness engaged in ongoing discussions with Wytrwal regarding her students and her classroom. Tr. Vol. III at 18. In addition, Voci discussed with Wytrwal her problems in

faculty members and special education personnel and Wytrwal. Tr. Vol. III at 57. Stickney testified that he did not put any of his criticisms into Wytrwal's evaluations because his nature at that time was "to avoid confrontation." Tr. Vol. III at 100.

**55.** Stickney testified that although he would put positive feedback in a teacher evaluation, he may not include negative criticism. Tr. Vol. III at 51. Stickney told the Court that if he were not comfortable in relating to an individual, he might not state clearly his position in a written evaluation. Tr. Vol. III at 52. Stickney testified that he did not identify any of the problems in the year-end evaluation because the evaluation form did not address those issues. Tr. Vol. III at 61–62. Stickney testified that the purpose in completing the year-end evaluation on Wytrwal was because it was overdue. Tr. Vol. III at 63. The Court understands this to mean that the evaluation was required by the teachers' contract and needed to be completed.

**56.** Goodness testified that in November of 1991, if there had been serious problems with Wytrwal's performance, he would have identified them. Tr. Vol. III at 14. Goodness did not have serious concerns about Wytrwal until January 1992. Swayed by her first year's performance,

Goodness did not conclude that things were different the second year until the special education class did not host, as they had previously, the holiday open house. Tr. Vol. III at 15. Goodness testified that because there was no holiday program the second year, he was "really disappointed." Tr. Vol. III at 16–17.

**57.** Voci designated a number of areas as needing improvement and he commented:

Classroom is organized; however, the program is unorganized. Knowing that we are dealing with behaviorally impaired students, it's not clearly evident that the most appropriate disciplinary procedures are being implemented. The program addresses the individual needs of some students—not all. Individual needs are not being addressed for those in the mainstream. After two years, all staff should be informed; however, that is not the case. Alienation of faculty and supervisor has occurred due to a sometimes confrontational style used when dealing with these professionals.

Ex. J–8. In Mowles opinion, the year-end evaluation was a fair assessment of Wytrwal's performance during her second year at Saco Middle School. Tr. Vol. I at 88.

**150**

getting along with other teachers and specialists as well as her difficulty getting and keeping the special education students mainstreamed. Tr. Vol. III at 147, 174. When the administrators spoke with Wytrwal about the these discrete issues it was never indicated that her continuing employment contract was in jeopardy. Tr. Vol. III at 173. The Court is satisfied that despite the dearth of criticism in Wytrwal's evaluations, the administrators attempted, albeit halfheartedly, to point out some of the areas where Wytrwal was having trouble. Therefore, Wytrwal has failed to establish that the reasons given for not renewing her contract are pretextual.

### C. Intentional Infliction of Emotional Distress

 In order to prevail on a claim for intentional infliction of emotional distress, Wytrwal must show that (1) Defendants acted intentionally or recklessly or were substantially certain that severe emotional distress would result from their conduct, (2) Defendants' conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community, (3) Defendants' conduct caused Wytrwal emotional distress, and (4) the emotional distress suffered by Wytrwal was so severe that no reasonable person could be expected to endure it. *Gray v. State*, 624 A.2d 479, 484 (Me.1993).

The administration probably should have pointed out issues of concern to them in Wytrwal's evaluations and informed Wytrwal that serious problems existed. Stickney, in particular, should have taken a leadership role in the situation. However, the reasoned basis relied upon by Mowles in making the decision not to renew Wytrwal does not reach the requisite extreme and outrageous conduct required for liability for intentional infliction of emotional distress.

### D. Wrongful Discharge

Although the Maine Law Court has not yet recognized the tort of wrongful discharge, it has not foreclosed the possibility of such recognition if the employer's motives violate some strong public policy. *Bard*, 590

A.2d at 156; *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 100 (Me.1984). Because the Court finds that Wytrwal's discharge was not done in retaliation for the remarks she made at the school board meeting, her discharge does not contravene any strong public policy. Therefore, even if this Court were to recognize the existence of a common law claim under Maine law for wrongful discharge, Wytrwal would not prevail.

Accordingly, the Court finds for Defendants on all Counts.

So *ORDERED*.